We're going to turn to our final case on the calendar this morning, Penny v. City of Los Angeles. It's Case 22-55572 and 22-55579. I understand the appellants are going to be splitting time, and so it looks like we'll be hearing from Ms. Rockowicz first. Thank you, Your Honors, and good morning. May it please the Court, Denise Rockowicz for Officer Consetti and Sergeant Azmi. I'd like to reserve five minutes for rebuttal. This is a case arising from the district court's denial of qualified immunity, and though we maintain that Officer Consetti's actions were reasonable as a matter of law on the first prong of the qualified immunity analysis, in the interest of time, I want to focus on the second prong. The Supreme Court has repeatedly stressed the importance of the doctrine of qualified immunity, and it has repeatedly instructed lower courts to not define clearly established law at a high level of generality. Officers are presumed to be protected by qualified immunity, and to be denied it, a case must be identified where an officer is acting under similar circumstances is held to have violated the Fourth Amendment. Here, the problem with the district court's opinion is that each and every case relied upon by the appellees and by the lower court is not even remotely factually similar to the case at hand. What about Voss? Voss is the city of Newport Beach. Right, so in Voss, you have a suspect that was 30 feet away from the officers, which is much further than Penny was from Officer Consetti. You have the officers not communicating with Voss at all, which is definitely not the case here, where they communicated with him, indeed even tried to placate him. Just a minute. Voss was indoors, right, and he was charging quickly at the officers, and he had, or they thought he had, or he had had a scissor, and he had hurt somebody already by then, right? Correct, yes. So basically the difference is the distance? The distance, the fact that the officers never communicated. So if they had waited until he got closer, that would have been different? He was running right at them. So that case didn't conclude that the officer acted unreasonably as a matter of law. It only determined that there were factual issues that precluded him from taking. But that's just wrong because what it determined was that a jury could have found it on the facts most favorable to the plaintiff, and that's the same thing as looking at the facts most favorable to the defendant for purposes of denying summary judgment. I don't see the difference. There is no difference. So the facts that were favorable, though, is that those officers never gave Voss commands, whereas the officers here gave multiple commands. The cases where force was found to be reasonable as a matter of law are cases where they never gave him a command to drop the, did they ever give him a command to drop the wooden stick or the wooden plank? By that time, they were telling, I think there was one command to drop it and then back up, back up, back up, was the primary command when it came to the wooden plank. Also, on Voss, the thing that I really want to highlight is the fact that when the officers fired, they had a position of cover behind police cruisers. That was not the case here where Consetti was feet away from Penny with nothing. But he could have. I mean, he had a lot more room than they did in Voss. He just made up his mind that if Penny crossed a certain spot, he was going to shoot him rather than back up. I think he did not have more room than he did in Voss. Voss started charging at the officers when he was 30 feet away. That's a lot greater distance than was the case here. And the officer here didn't have any cover. And as soon as Penny crossed that threshold. Wait a minute. Wait a minute. I mean, he clearly had cover. There were all kinds of officers there with other types of weapons. So I don't think that's right to say he didn't have cover. I mean physical cover. The officer in Voss had a cruiser. He had his cruiser door blocking between him. He was careful. There were walls and there were cars, and he made up his mind he was going to stand there, but there was no reason he had to be standing there. He could have backed up. True, but the officer's subjective decision to, in terms of crossing that line, is not what is analyzed under the Graham analysis. The Graham analysis requires us to look at the facts and circumstances presenting Consetti without regard to his underlying intent or motivation. So here we need to look at when Penny came around the corner of that garage and Officer Consetti said, It's only relevant as to your statement that he didn't have cover. He didn't have cover because he chose to stand there, but he could have backed up. Well, that still doesn't provide him with cover, though. There was nothing that could have blocked in between him and Penny, which is entirely different from Voss, where you have a physical barrier between the officer and the suspect, which was the door of a cruiser. Also important to note in Voss is that the cases that were relied upon by appellees here, Daryl and Brian, were gone through by the court in Voss and said specifically that they don't apply in situations like this. So because Voss acted aggressively, which Penny did here, those cases where you have people who did not advance on officers, people who obeyed instructions to put down weapons when they were given to them, which didn't happen here, those cases, Deorley, Glenn, Drummond, where you have compliant, unarmed suspects, they're not applicable in a case, whereas here you have a noncompliant, aggressive suspect who's armed and advancing on an officer. Everything you just said applies to Voss. So that set of words you just said all apply to Voss. So therefore... I don't mean to interrupt you, Your Honor. Voss was never given any commands to make his behavior noncompliant. That is not true here. Penny was given dozens of commands to drop his various weapons throughout the encounter. He was told back up, back up, back up multiple times. That didn't happen in Voss. And, you know, again, he was further away, and he was approaching officers who had a physical barrier between them and the armed suspect. I have to look at the video again in terms of availability of cover. My impression is the same as Judge Bress's, but I have to look at it again. All right. So a little more specific on that threat, which the district court found was nonexistent, three officers simultaneously perceived it, with Concetti firing his handgun, Officer Robles firing his 40-millimeter, and Officer Spraggins firing his... Yes, but they were directed to use the nonlethal force, and Concetti just decided to use lethal force. Right. Concetti was the closest to Penny. So if an officer was going to be injured by that board being used as a jabbing instrument, it was going to be Concetti. And the district court... Not really. He's not really. I mean, even if he swung the board around, you could tell that would still be many feet away from where Concetti was at the time he shot him. Well, he's taking steps towards Concetti, which is another thing that the district court... As the report from the OIG, whoever it was, said, he took two small, slow steps. He certainly wasn't running at him at all. Well, there was an issue that's very similar to what was raised in the Chappelle v. City of Cleveland case and discussed by the Sixth Circuit. The district court in that case said, okay, the suspect wasn't, quote, towards officers and was holding the knife in an upward position, which is not a position to directly threaten the officers. And the Sixth Circuit noted that semantics aside, the suspect was indisputably moving forward towards the officers, which... Does it matter that this was not a knife? It was a board? I mean, it presumably could hurt somebody, but it wouldn't be easy? Well, and that's the other component that's important in Chappelle is that the lower court said, okay, this knife was held in a manner that wasn't threatening. And the Sixth Circuit said, look, it's improper for the lower court to assume that there's no threat based on the position of the knife being more of a task. It was a knife. This was not a knife. So dismissing the threat posed by the board here is equally improper because the court completely dismissed the fact that it can be used as a jabbing instrument instead of a swinging instrument. That jabbing instrument could have been used at Officer Consetti's neck, face, his outstretched arms, which were holding a firearm, which undoubtedly would have caused serious bodily injury to Consetti if he was struck in either the face or the neck or if he had his weapons knocked out of his hands. I mean, I don't think there's... I think... I appreciate your point that there's a threat. The question is, does the threat justify shooting him? I think when you have cases like Sheehan, the Supreme Court case, saying you can use deadly force when an officer is in, you know, eminent fear for serious bodily injury, I think getting jabbed in the throat with a board, yes, that's a serious bodily injury. Having your firearm knocked out of your hands with a board, yes, that would be indeed a serious and if not deadly threat. And so that threat, I think, is entirely reasonable, especially when you consider the fact that he had a second as Penny came around that garage threshold to perceive the threat and act upon it, and it was in circumstances where inaction by Consetti could result in serious injury to himself. So, yes, absolutely deadly force was proper in that circumstance. You know, I'm reading Voss, and nothing in Voss says anything about them having cover that I can see. Am I wrong about that? Yes, they were behind the police cruisers. I'd have to pull the case. Hopefully highlighted. It says they have less intrusive force options. The officers also had the doors surrounded, let's see, and had established defensive cover using police vehicles. That is at page 1033 of Voss. And it looks like I only have three minutes left, which I'd like to reserve unless there are further questions. Sure. Let's hear from Mr. Eisenman. Thank you. Good morning. May it please the court, Jonathan Eisenman for the appellants in 22-55579. I'd like to start by establishing a baseline, which is that the court should at least apply ringspeed to remand the district court with instructions to consider vacating its own order. But having said that, I think this is a case where this court itself could vacate the order as to the individual officers in the 79 appeal pursuant to Munsingware. I understand the principal objection to that is going to be, well, if you wanted to get rid of this order, you shouldn't have settled. But I think the settlement here is really more a capitulation on Mr. Penny's part than it is a settlement on the officer's part. I think any lawyer put in the position of someone advising the officers here could not say you've been offered voluntary dismissal from this matter with prejudice. What is the prejudice? I mean, I recognize your clients don't want a decision out there like the one the district court issued. At the same time, the decision is a district court decision. It's not preclusive. So what is the prejudice that you're arguing here? So the prejudice is, I mean, I guess we could call it, and I'm sorry for the euphemism, good jurisprudential hygiene, which is not to leave outstanding this order that could eventually. But what we have here is an order that also applies to Conchetti, who is still in the case. And so you couldn't just vacate it. You'd have to rewrite the whole thing. I think it could be vacated in part. I recognize that is, in this case, if you were actually to go through and try to interlineate the order, scratch things out, it might prove difficult to do. I think an order that just says that it's vacated as to the officers who are not Conchetti. But then your concern, which is with the reasoning and the opinion, is still there. So you're not going to eliminate the reasoning, or you're not going to eliminate the reliance on Dior, for example. And also, this is not a final judgment, so it couldn't be preclusive of anything. So what do you accomplish? So let me take the second part first. I think the fact that it can't be preclusive of anything suggests that the officers aren't really – it pushes the equities in favor of vacating it. In terms of the reasoning, I think it's the application of the reasoning to the use of the less lethal weapons here that's problematic. That's the expansion of Dior. I think if you're – But that's not binding. Even if that expansion is wrong, as you claim, that's not binding on anybody. I understand that, Judge Bryce. My concern is that these things can accumulate. They may not become binding. They could be used later to assert that something had been clearly established by this opinion. And I think it's better to nip that in the bud before we proceed to leave outstanding an opinion that – But plus there's the fact that you did agree to this without dealing with the vacation at all. And I understand that you have a reason why you signed off on it, but you did sign off on it. And the case law seems to be that when there's a voluntary settlement, the Munsonware rule doesn't apply. So to that, two things. One, I think that's why I established – I want to establish at least that Ringsby would be appropriate, if not Munsonware. But here I do think that what we've signed off on is – The alternative would be to oppose a voluntary dismissal in order to vindicate a right to get costs or fees. You don't have to oppose it. You would just say, go to the judge and dismiss it. We're not stipulating to it. But we've done that, Judge Brezon. I'm not sure what difference it ends up making. I mean, it seems a bit semantic there. So either we don't stipulate to it or we just don't oppose it. It seems like the result is the same. You either stipulate to this or refuse to oppose the motion to the same effect. It seems formal refunction in that sense. And the fact that what the officers gave up to settle here is de minimis, if anything. It suggests to me that it really is no different than Mr. Penny just deciding to abandon his cases to these officers. What case did you say you're relying on other than Munsonware? Other than Munsonware? Yeah, you said you're applying the court. Oh, I'm sorry. Bringsby is this court's case. And it suggests that if there's a settlement, you can remain to the district court with instructions to consider vacating its own order. Is there any other live issue that you're asking us to decide other than this vacator issue? As to the clients in the 79 appeal? Yes. That's great. It's just the vacator issue. And I see I've almost exhausted my time. What about Mr. Officer Asme, who was not dismissed, but they say they're going to dismiss him? So Officer Asme is not my client in the case. Sergeant Asme is Ms. Brockwich's client. Perhaps she could speak to what to do with him. Thank you. Okay. Thank you, sir. Let's now hear from Ms. Ricketts. Thank you, Your Honor. Good morning, and may it please the court. Morgan Ricketts on behalf of appellees. I do want to address first the fact that when an officer creates the very emergency that he then resorts to force to resolve, he's no longer simply responding to a preexisting situation. And the court can consider that in determining that the force was unreasonable. That comes from Nehod v. Browder, which was cited in the brief where the Ninth Circuit reversed the grant of qualified immunity. And Diorle pointed out that the officer in that case had a clear line of escape, just like here. Concetti could have, and this is a quote from Diorle, could have easily avoided a confrontation by retreating. And that's exactly what happened here. There was a wooden board. And as the court asked earlier, he was still 10 to 12 feet away, would not have been able to swing a four-foot board sufficiently to injure the officer from that point if Concetti had. Was he 10 to 12 feet away, or I thought somebody said he was six feet away? No, he was not six feet away. The record, I think, is, you know, I don't have that citation, but. Counsel, this is Judge Rawlinson. What case says that an officer has to retreat in that context? I don't think that any case says the officer has to retreat. But like I said, in Diorle v. Rutherford, that was one part of the court's analysis, that Diorle had a clear line of escape. He could have just defused the situation by just backing up. What about this question? I didn't really see where Voss relied at all on the fact that the officer had cover. But my understanding here was that there were police cars around. There were walls around. And I have to go look at the video again. But I assume it wouldn't have been difficult to get away from, to move somewhere where there was cover. Well, certainly there was a garage that Officer Concetti had purposely advanced about 20 feet to stand right next to. And he could have stood behind that garage instead. I don't recall. That's an interesting question. If there were cars present in the alley that he could have used as cover, I'd have to look at the video again. And that would be 9 ER 1703 was Concetti's video. There was a warning to Penny that he was going to be beanbagged, but not that he was going to be shot. Is that right? Correct. So Sergeant Azmi and I think maybe another officer called out, you know, beanbag him. I will beanbag you. So it was threatened to Mr. Penny. And I think that goes to why he was holding the board in the manner he was holding it, which was lowered against his body as a shield with his legs on either side of it. You know, he'd been just threatened with being beanbagged. He's trying to protect himself. He's trying to protect his vulnerable parts. So when he was asked why he did it, he said to scare the police. Well, when he was asked why he had initially raised the board, yes, he did say that. You know, again, this is a person suffering a mental crisis that the officers should have been aware of. Concetti himself testified that he had heard Mr. Penny indicate he just wanted the police to kill him. And that's a clear sign of mental illness. What relevance is the mental illness? Because it's apparent from watching the video that he's undergoing some kind of mental episode or perhaps that is his normal state. But at the same time, I guess there's a question of whether that actually diminishes the threat, just to simply know that somebody is harboring a mental illness. What's your view on that? Well, you know, this circuit has a practice going back decades of requiring officers to use less intrusive alternatives when dealing with the mentally ill. There's lots of language in Diorle, in Drummond, in Glenn versus Washington County, Bryan versus McPherson, acknowledging that in the case of mentally unbalanced persons, even when they're acting out and inviting officers to use deadly force to subdue them, the governmental interest in using such force is diminished by the fact that the officers are confronted not with a criminal but with a mentally ill person. There's language saying, you know. How far does that logic go, though, when the person is holding a weapon? Certainly, you know, it would depend on the facts of the case. Obviously, in Voss, this person was believed to be holding scissors that he had previously used to injure somebody. He was charging the officers with it raised over his head. And yet, in the facts of that situation, it was held to be unreasonable. How does all this comport with the Casella case in the Supreme Court? Well, I think Casella, you know, did not address whether the force was reasonable or not. It specifically avoided that question. And Casella just found that in 2015, when it was decided, it was not clearly established at the time that the officers had acted unreasonably. The problem is that on any objective view, it seems to me that the person in Casella was a lot less of a danger. I mean, she had a knife, but she wasn't doing anything with it. She wasn't threatening anybody. She didn't say anything. They gave her two orders to drop the gun and then shot immediately, and that was it. This was a prolonged confrontation. The main reason, the main difference may be he didn't have a gun. I mean, a knife. I mean, whatever he had could be a weapon, but it was a lot less likely to hurt anybody. But other than that, and I guess what you're also saying is, well, Voss came after, so Voss was clearly established law that didn't exist at the time of Casella. Is that basically your point? That's exactly what I'm saying, Your Honor. You know, Casella was… Because the Supreme Court didn't think much of you early. Correct. Yes. So, you know, in Casella, the Supreme Court, again, sidestepped the question of whether the conduct was reasonable. There was an impassioned dissent arguing that, you know, the facts of that case could have been viewed as unreasonable by a jury. But the only decision that court made… I was on the panel of Casella, so I feel rather strongly about it, i.e. that it was an inexplicable decision. But that's a different question. So, yeah, so the only decision that the court made there was just that it wasn't clearly established. So with 2019's decision in Voss, it's a totally different ballgame here. And as the appellants have only addressed the issue of whether case law was clearly established, I think it's not really applicable here. Counsel, are you abandoning your claims against Sergeant Asney? Yes, Your Honor. And what about the Monell liability? Where do we stand with that claim? Monell liability? I believe we also abandoned that. That's why we dismissed the — we settled with the city and the other city defendants. And just to go into that… With regard to — just to clean up the pieces, with regard to the state law questions and pending jurisdiction, there's nothing to be pending to at this point. Correct. This is solely an appeal for the denial of qualified immunity on the Fourth Amendment claim. But they originally were seeking the exercise of pending jurisdiction, but there's nothing to be pending to now because the defendants who were there aren't there anymore. Correct. All right. Okay. I did want to address Chappelle, which my colleague referenced in her argument. Chappelle was a case where the officers were looking for an armed robber who was known to commit robberies with a knife. They entered a small bedroom where there were — you know, there were obstacles, and this person's coming at them with a knife. So, you know, that's a completely different case, the fact that there was a short distance is not dispositive. And, in fact, in Hayes v. County of San Diego, the Ninth Circuit said even though the plaintiff was within six feet of the officer coming towards him holding a knife, that fact was not dispositive. Next, I'd like to address — let's see. Now, you said something. My understanding here is that they are appealing both the merits of the Fourth Amendment issue and the clearly established law prong. Is that right? Yes, and I can certainly address that. In their briefs, they did. Just in oral argument, they just limited their points to the clearly established prong. But certainly, I can address the reasonableness. So there's many reasons that this was found to be unreasonable by the LAPD. It's not — it's an extreme case where the OIG, the Board of Police Commissioners, and the LAPD agree that this was unreasonable. No reasonable officer would have perceived him as a threat. And the district court agreed with that based on all of the factors identified under Graham and identified by the Ninth Circuit. He would have been perceived as a threat. The question is whether it was a threat that justified lethal force. I mean, as I understand it, in some ways, the strongest point in your favor is that the officer who was in charge ordered the use of nonlethal force. And the people — the other two officers used nonlethal force. So I don't think the notion that he wasn't a threat at all is very strong. It's the notion that he wasn't a threat that justified the use of lethal force. He wasn't a lethal threat, put it that way. I think that's right. I think that, you know, the fact that Sergeant Azmi and everyone on scene understood that less lethal force was going to be used certainly is a fact, militating against the use of less lethal force. And even after the fact, they were all shocked to learn that there had been a shot they didn't even realize. Correct. And it's also important to remember there was a lethal officer designated, Officer Antelec, who did not fire at the moment. And there was a second officer who had taken out his pistol who did not fire. That was Officer Lara. So we have three officers who have lethal force available and only can say he chooses to shoot. I also just note that the district court found that the less lethal force was also unreasonable. But again, you know, that's not an issue here in this appeal. And the fact that three officers shoot simultaneously, again, it's not dispositive. In Voss, there were three officers that fired simultaneously, two of which were using guns. And the court did not find that to be evidence of reasonableness just because more than one person chose to shoot at the same time. But in Consellas, there's another reason why Consellas is a problem, because in Consellas, there were three officers and only one shot. The other two didn't see any reason to be shooting. Correct. Yes. In that case, it was worse because there were other officers who wanted to just continue to talk to the person. But again, it was decided purely on clearly established grounds. But yes, the district court went through, you know, numerous factors that have been identified in the Ninth Circuit. The fact that the officer should have perceived this person was experiencing a mental crisis, as evidenced by the fact that Officer Consetti heard him say, just kill me. The fact that they had time to formulate a plan. To repeat Judge Perez's question, that point is made many times in our case law, but exactly how does it operate? I mean, because there are also a number of cases, including Chappelle and others that I've sat on, where a person obviously is having a mental crisis but really is a danger, you know, has a gun or a knife and is threatening to use it. So in those circumstances, it doesn't make a difference. So when does it make a difference? I think it makes a difference in the creation, you know, of a plan. The opportunity they have to think about what they're doing. The fact that they're outnumbered. And just requiring them to use less forceful tactics, as this court has recognized again and again. I mean, in Sheehan, right, the city and county of San Francisco versus Sheehan, we had, again, tight quarters. A woman with a knife charging the officers. They tried to use less lethal first. It was ineffective. The pepper spray didn't work. If there's a specific case that the court wants me to address, I can. But I think typically there's just factual distinctions. And here, the district court found the undisputed facts went one way. At worst, on denial of qualified immunity, if this court disagrees with that, it still would be just facts in dispute. Because, yes, he had raised the board previously. But by the time he was shot, he had lowered it. And he was holding it like a shield. And Officer Kinsetti had had time to process that. He was having a verbal exchange with him. He had time to either back up, give him another warning, you know, that he was going to shoot. Not another warning, but an initial warning that he was going to shoot and use lethal force. You know, he had the option to allow his fellow officers to cover with less lethal. And finally, I guess I'll just address briefly Mr. Eisenman's argument. I think there's nothing for this court to vacate. The parties have settled. There's nothing at issue here. It's not binding. And so we would just submit that it should not be the district court's decision should not be vacated or edited in any way. And unless the court has further questions, I'll yield my time. Thank you, Ms. Ricketts. And Ms. Rockowitz, let's hear a rebuttal from you. The first thing I want to address is this notion of him using it as a shield that was repeated multiple times. In the McCormick case out of the 11th Circuit, the suspect was given multiple commands to drop a walking stick that were ignored and lower levels of force were ineffective. Both of those things were true here. And similar to Penny claiming that the board was being raised. The lower level of force that was ineffective was a taser that didn't work. Correct. It wasn't ineffective. I mean, it isn't like he was some super person who wasn't going to be affected by a taser and said it just didn't connect because it was broken, as I understand it. It was questionable whether the prongs attached, I think, was the issue. Well, I think the conclusion was that it didn't. One of them didn't. So that lower level of force was used, though, in an attempt that I don't think the officers knew at that point whether or not the prongs had been ineffective in attaching to him or not. I think that's something that we found out in hindsight. But they also had two other forms of nonlethal force that they were ordered to use and did use at the same time. Correct. Yes, two other officers perceived the threat posed by Penny as he rounded that garage corner door. I thought they were told by ASME to do it, and they did it. One, ASME instructed the beanbag, not the 40 millimeter. But I want to get back to the shield issue because that almost identical argument was rejected in McCormick, who made the subjected claim that he lifted his hands in submission and instead focused the threat of McCormick undisputedly continuing to hold the stick and come towards officers. And that's really what I need to repeat over and over again. These cases that counsel cited in terms of mental illness, Dior, Lee, Glenn, Drummond, the officers had knowledge of the mental illness before they arrived on scene, which is not true here. And then, more importantly, the Supreme Court made it very clear in Sheehan where deadly force may be used, even against individuals who are mentally ill, if there is that threat. One man is yelling at you repeatedly, what's the real blunt, and won't say anything else, and doesn't seem to understand what you're saying, and talks about you can kill me, and I don't want to save the world and all that. Do you think he's okay mentally? He's probably not okay, but he could be intoxicated. He could be mentally ill, but more importantly is the threat that he poses. And at that moment, if he's posing a threat, it doesn't matter if he's intoxicated or mentally ill. I understand that. The problem is that you said, well, they knew he was mentally ill. And I say, well, this person certainly had very good reason to think he was mentally ill here just from what he was doing. So then you shift off to something else. So that's fine, but you have to stick to one thing and not keep moving around. Well, what I'm saying is not that it doesn't matter or that they didn't know. I'm saying that the cases where the force was found to be unreasonable, that the court cited, that counsel keeps citing, are different circumstances. There are circumstances where they were called out for mental health crises. That's not the case here. And then on top of that, there are circumstances where there was no threat. Well, they were called out because there's a screaming man. Right. And there's a similar case to that, the Reynolds case, where there was a report of a man acting strange at a gas station. That's one of the cases we cite in terms of the cases that are more in line with ours, where there was orders to put down weapons, where there was noncompliance, where there was a suspect who advanced. I mean, specifically we've got that Lau case, Woodward, Garcia, Reynolds, McCormick, Blanford, Chappelle, Ventura. All of these cases that you have more similar facts than non-armed, non-aggressive suspects on which the district court relied, all of those make Concetti's mistaken belief that, or even if it was mistaken, that Penny was preparing to hit him or jab him with that wooden board reasonable. And if that's a reasonable mistake, then under the qualified immunity cases, he should be granted qualified immunity. And you can't say that it wasn't reasonable when there is just a whole host of opinions that are very similar with a weapon in close proximity approaching an officer and where you have a split-second decision as he comes around the corner of that garage. Concetti has to decide. This is not a case where they talked about it in advance. This isn't a Ruby Ridge situation where they decided, okay, we're going to shoot and shot as planned. He had seconds as those two steps were coming towards him to assess the threat of the board. He didn't have the luxury of multiple cameras. But what is the point of having a supervisor making decisions if you don't follow what the supervisor says? Well, I mean, that might be an LAPD policy issue. That's not a Fourth Amendment issue, because whether or not the force was reasonable is what matters here. It doesn't have something to do with whether the force was reasonable, that you have a supervisor who's calling the shots and you don't follow what he says? No, I don't think it does, and we cited those cases in our brief, the Broussard case, the Fowler case, the Billington v. Smith. Negligent tactics are insufficient to establish a constitutional violation. It's not a question of negligent tactics. Here you had a relatively well-organized response, and they were trying to talk to him, and AFSCME was in charge, and this guy kind of goes off on his own. Well, I think the dynamic rapidly changed at minute 715 of Exhibit 1 when Penny's behavior became markedly more aggressive. The situation escalated. He started saying F you to the officers, charged at them with the board, held like a swinging instrument. Then he takes kind of a turn around the corner of the garage where Consetti can't see him and then suddenly appears around the corner of the garage with the board, takes two steps towards Consetti, and that's when Consetti fires. So the dynamic changed at some point, and it was when Penny forced the issue similar to the suspect in Lowell, forcing the issue by advancing on the officers in that moment changed the dynamic. And I'm over time, so unless there are further questions, I would thank your honors. Thank you very much for your argument. Again, I want to thank all counsel for the helpful briefing and argument. These two matters are submitted. That concludes our calendar for this morning, and we'll stand in recess until tomorrow morning. This court for this session stands adjourned. Recess
judges: BERZON, RAWLINSON, BRESS